UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

CHEVRON U.S.A., INC.

                                                    CIVIL ACTION

VERSUS

                                                    NO. 08-76-JJB

ENERGEN RESOURCES CORP. ET AL.

## RULING ON MOTION FOR SUMMARY JUDGMENT

Before the court is plaintiff's, Chevron U.S.A. Inc. ("Chevron"), motion for summary judgment. Doc. 55. Defendant, Energen Resources Corp. ("Energen"), has filed an opposition. Doc. 64. Both parties have filed additional memoranda in support of their positions. Docs. 68, 75, & 79. Oral argument with respect to this motion is not necessary. This Court's jurisdiction exists pursuant to 28 U.S.C. § 1332 *et seq*.

## Background

J. Gerald Dupont, the owner of property covered by an oil and gas lease referred to by the parties as the "Gay Union Lease,"[1] brought suit against, among other entities, Chevron and Energen ("The Dupont Litigation"). In the Dupont Litigation, Mr. Dupont

---

[1] A brief overview of the history of the Gay Union Lease is helpful in understanding the relationship between Chevron and Energen.

In August of 1930, Gulf Refining Company of Louisiana ("Gulf of Louisiana") was granted the Gay Union Lease on the Dupont property. Shortly thereafter, Gulf of Louisiana assigned an undivided one-half interest in the Gay Union Lease to Standard Oil Company of Louisiana ("Standard Oil"). Gulf of Louisiana retained an undivided one-half interest in the lease.

Gulf of Louisiana then assigned its one-half interest to Gulf Refining Company who in turn sold that interest to Gulf Oil Corporation in December of 1956. Subsequently, Gulf Oil Corporation merged with Chevron.

Standard Oil assigned its one-half interest to Louark Producing Company ("Louark"). Louark then merged with Carter Oil Company which in turn merged with Humble Oil & Refining Company ("Humble"). In December of 1967, Humble sold its one-half interest to Texas Gas Exploration Corporation ("Texas Gas"). Texas Gas merged with CSX Oil & Gas Corporation who in turn merged into Total Minitome Corporation ("TMC").

In April of 1990, Chevron sold and assigned its one-half interest to TMC. Thus, it appears the Assignment resulted in TMC having a 100% interest in the Gay Union Lease. It is the provisions of this Assignment that are at issue in this suit. TMC's name was thereafter changed to Energen Resources MAQ which then merged into Energen Resources Corporation.

*See* Chevron's statement of uncontested facts, Doc. 55-2.

alleged property damage arising out of historical oil and gas exploration and production on the Dupont property.[2] The parties in the Dupont Litigation reached a settlement agreement whereby the three remaining defendants, including Energen and Chevron, would pay a one-time cash payment as well as engage in remediation efforts on the Dupont property.[3] The Settlement Agreement does not allocate between claims or assign percentages of fault. It is uncontested that the three settling defendants split the cash payment and remediation costs three ways and that future remediation may be required.[4]

Chevron now brings this suit against Energen, based upon an Assignment and Bill of Sale ("the Assignment") selling and assigning Chevron's interest in the Dupont Property to Energen's corporate predecessor, Total Minatome Corporation ("TMC").[5] Chevron argues that the Assignment requires Energen to pay Chevron's portion of the cash payment and remediation costs as well as Chevron's attorney fees, expert fees, and other costs and expenses of defending itself in the Dupont Litigation.[6] Chevron also seeks a declaratory judgment that Energen must pay Chevron's portion of future remediation costs.[7]

---

[2] The specific claims in the Dupont Litigation involved negligence, trespass, failure to warn, strict liability, punitive damages, lease law, breach of contract, obligations under the mineral code, and unjust enrichment. Dupont Litigation Complaint, Doc. 55-19, Exhibit 17.

[3] The Dupont Litigation Settlement Agreement has been filed under seal. Doc. 61.

[4] *See* Chevron's statement of uncontested facts, Doc. 55-2.

[5] Energen admits that it is the corporate successor of Total Minatome Corporation.

[6] Chevron seeks fees, costs, and expenses associated with its defense in the Dupont Litigation totaling $1,618,301.43; $773,207.71 for remediation costs it has already paid; and $1,776,666.67 for the portion of the cash payment it has paid.

[7] Importantly, the Dupont Settlement Agreement reserves the settling parties' rights "to seek defense, contribution and/or indemnity against one another" in regard to both the cash payment and remediation costs. Doc. 57-2, II(A)(3). The Settlement Agreement further states that it is not an admission of liability on the part of any of the defendants and does not allocate responsibility among the three defendants. *Id*. While the Settlement Agreement purports to be in settlement of all of Dupont's claims, it does not distinguish between the amount of

## Analysis

Chevron argues that two provisions of the Assignment – made effective "as of 7:00 a.m., Central Daylight Time, the first day of April, 1990."[8] – require Energen (as assignee) to pay Chevron's (as assignor's) portion of the cash payment and remediation costs as well as the costs of its defense in the Dupont Litigation:

> Assignee shall assume all obligations and liabilities relating to the ownership or use of the Assigned Interests…which are incurred subsequent to the Effective Date of Sale (except that taxes shall be prorated as of the Effective Date of Sale and any obligation associated with an agreement for the supply of material or service shall be assumed only to the extent that the material or service with respect to which such payment is due is received by Assignee after the Effective Time) and including but by no means limited to reclamation and the plugging and abandonment of all wells, whether now or hereafter located on the Leases transferred hereunder. Such reclamation and plugging and abandonment shall be performed in a good and workmanlike manner and in accordance with the rules and regulations of the Louisiana Commissioner of Conservation and all other applicable laws. **Assignee shall indemnify and defend Assignor, its officers, directors, agents or employees against any and all loses, claims, suits, controversies, liability and expense arising directly or indirectly our of Assignee's ownership and use of the Assigned Interests as of the Effective Time**….Assignee shall assume and be responsible for all obligations of Assignor accruing under such [existing leases, operating agreements, etc.] as of the Effective Time.

> The Leases and Personal Property being conveyed herein have been used in connection with oil and gas production and storage activities. As a result of such operations, surface and/or subsurface contamination of the Leases or Personal Property may have occurred. In light of the foregoing, the parties agree that by this Assignment and Bill of Sale, **Assignor is transferring to Assignee, its successors and assigns, all responsibilities and liabilities to any and all contaminated surface and subsurface areas on the Leases and for contamination of the Personal Property. The**

---

the cash payment attributable to specific claims or compensatory versus punitive damages. However, the Settlement Agreement does state that the cash payment is for damages and is not intended to be used toward remediation. *Id*. at II(B)(5).

[8] Doc. 1-2, page 3.

**Assignee, its successors and assigns, shall indemnify, defend and hold Assignor harmless from any costs, claims, judgments or liabilities arising out of past operations of the Assets which may have been in violation of any applicable federal, state or local law, rule or regulation.** It is the intent of the parties that this provision shall run with the Leases and be binding upon all successors-in-interest to the Assignee.[9]

Energen argues that there are allocation issues that preclude summary judgment. Specifically, Energen asserts that the language indemnifying for violations of federal, state, or local law does not include negligence. Thus, Energen reasons, that portion of the settlement due to negligence is not covered by the indemnification provision. Second, Energen argues that the provisions do not indemnify Chevron for the consequences of Chevron's own negligence; therefore, a determination of Chevron's negligence is required before a court can determine the extent of indemnity. Finally, Energen argues that a factual determination of the amount of settlement made in satisfaction of punitive damages must be made. Energen argues that Chevron should

---

[9] Doc. 1-2, pages 4-5 (emphasis added).

Chevron and Energen dispute the meaning of both the first (the first paragraph quoted above) and the second indemnity provision. As to the first indemnity provision, Energen asserts that it only indemnifies Chevron for losses and liability arising out of Energen's (or its corporate predecessor TMC's) ownership and use of the property *after* the effective date of April 1, 1990. Chevron asserts that the language "as of" in the first indemnity provision is not synonymous with "after" and that the provision sets forth a duty to indemnify Chevron that is unlimited in scope and covers both past and future ownership and use. This Court finds that Chevron's arguments as to the possible meanings of "as of" only seek to obscure unambiguous language. A comparison of the first and second indemnity provisions make it clear that the first addresses losses and liabilities due to Assignee's ownership and use of the property beginning on the effective date and continuing thereafter. There has been no showing by the parties that the Dupont Litigation arose solely out of Energen's ownership and use of the interests on or after April 1, 1990. Indeed, the plaintiff in the Dupont Litigation alleged negligent operations dating back to the 1930s. However, it is possible that some of the negligent operations occurred after April, 1 1990 when Energen appears to have been the owner of 100% of the interest in the Gay Union Lease.

In contrast to the first indemnity provision, the second addresses past oil and gas operations and is not limited to a time period on or after the effective date of the Assignment. It appears both Chevron and Energen were involved with the Dupont property prior to the 1990 Assignment. Thus, both the first and second indemnity provisions are potentially applicable and the court will analyze the language of both.

not be able to seek indemnification for any payment made by Chevron in satisfaction of punitive damages claims against Chevron in the Dupont Litigation.

Energen's first argument, that the language in the second indemnity provision covering violations of "any applicable federal, state or local law" does not include negligence, is easily disposed of. This Court finds this argument unpersuasive, as a claim asserting negligence is clearly based on Louisiana law.[10]

More persuasive is Energen's argument that indemnity provisions are strictly construed and that in order to "secure indemnification for one's own negligence, the intent of the parties must be expressed in unequivocal terms."[11] Chevron responds by asserting that "the occasion for any liability to be placed on Chevron for its 'own negligence' does not exist"[12] because it never operated wells on the Dupont property and that at the time of the Assignment, TMC (now Energen) was acting as operator on the property. However, a review of the Operating Agreement entered into between Gulf Oil Corporation (which later merged with Chevron) and Humble (which later sold its one-half interest to Texas Gas which eventually became Energen) indicates that the non-operator (Gulf) exercised a significant amount of control over the operations of the operator (Humble). For example, written consent of the non-operator is required for a single expenditure over $5,000.00, wells to be drilled at the joint expense of the parties generally are to be mutually agreed upon, and mutual consent is generally needed to abandon a well.[13] Based on this control, this Court finds it possible that Chevron,

---

[10] La CC art. 2315.
[11] Doc. 64, page 6.
[12] Doc. 68, page 9.
[13] Doc. 55-25, Exhibit 24, ¶ V, VI, & IX.

5

despite its position as non-operator, could potentially be found negligent for damage to the Dupont property.

In *Polozola v. Garlock, Inc*,[14] the Louisiana Supreme Court stated that indemnity contracts are "strictly construed, and such a contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent act, unless such an intention was expressed in unequivocal terms."[15] The *Polozola* court found that the language "whether caused by [indemnitee's] negligence or otherwise" sufficient to indemnify the indemnitee against the consequences of his own negligence. In *Berry v. Orleans Parish School Board*, the Louisiana Supreme Court found language that indemnitor would indemnify "from all claims, demands, suits, damages…regardless of whether or not it is caused in part by a party indemnified hereunder…" was sufficient to indemnify an indemnitee against his own negligence.[16] *Berry* is significant because the court there found an indemnitee indemnified against its own negligence even though the agreement did not specifically address "negligence." However, the agreement did specifically contemplate the indemnitee as a potential cause of a claim, demand, suit, or damage.

In contrast to *Polozola* and *Berry*, generalized language indemnifying against "any and all liability damage, costs, fees and other losses of whatever nature…" has been held to not unequivocally express the intent to indemnify against the indemnitee's own negligence.[17] Further, when the intent of the parties is ambiguous, "a presumption

---

[14] 343 So.2d 1000 (La. 1977).
[15] *Id*. at 1003.
[16] 830 So.2d 283, 284 & 287 (La. 2002).
[17] Arnold v. Stupp Corp., 205 So.2d 797 (La. App. 1 Cir. 1968). *See also* Adams v. Falcon Equipment Corp., 717 So.2d 282 (La. App. 2 Cir. 1998).

or inference arises that the parties did not intend to hold the indemnitee harmless from

such liability."[18] Looking to the first and second indemnity provisions, both make use of

generalized indemnification language. The first indemnifies against "any and all losses"

while the second addresses "any costs, claims, judgments or liabilities arising out of part

operations." Both Chevron and Energen were involved with past operations of the

Dupont Property. Although Chevron argues that the second provision includes "explicit

and clear" assumption of liability for past operations and any contamination of the

property,[19] in this Court's reading, neither indemnity provision clearly expresses the

parties' intent to indemnify Chevron against its own negligence. Because such intent is

ambiguous, the presumption against such indemnification for Chevron's own negligence

controls.

Because Chevron could possibly be found negligent, and because the indemnity

provisions in the Assignment fail to clearly and unambiguously provide for

indemnification of Chevron for its own negligent acts, a genuine issue of material fact

exists as to whether and to what extent Chevron was negligent and what portion of the

Dupont settlement is attributable to that possible negligence.[20]

---

[18] Home Ins. Co. of Illinois v. National Tea Co., 588 So.2d 361, 364 (La. 1991).

[19] Doc. 68.

[20]     The court notes that Energen also argues that an allocation issue precluding summary judgment exists as to punitive damages. Plaintiff in the Dupont Litigation alleged a claim for punitive damages arising out of former Louisiana Civil Code article 2315.3. The Louisiana Supreme Court has stated:

> [T]o recover punitive damages against a defendant under former Article 2315.3, a plaintiff must show that the defendant had actual possession or control of the hazardous or toxic substance that caused injury, and then handled or otherwise dealt with that substance at some time prior to the injury-causing event.

Ross v. Conoco, Inc., 828 So.2d 546, 556 (La. 2002).

Energen argues that it never stored, handled, or transported toxic substances on the Dupont property. It insists that "[i]mposing punitive damages liability on Energen for the acts of another entity, whether its corporate predecessor Total, or its purported indemnitee Chevron, is not permitted under Louisiana law." Doc. 64, pages 12-13.  In response, Chevron argues that the Assignment itself states that the property had been used for storage

Although Chevron asserts that "Energen's attempt to raise apportionment of the Settlement Agreement to identify what was paid for any specific cause of action is improper,"[21] this Court finds that it cannot determine the extent of indemnification without such apportionment. The two indemnity provisions fail to unambiguously provide indemnity to Chevron for its own negligence and because it appears there is a possibility that Chevron could be deemed negligent, summary judgment in favor of Chevron would be improper.[22] Further, without a determination of Chevron's possible negligence, an award of legal fees, costs, and expenses would be premature.[23]

### Conclusion

For the reasons discussed above, Chevron's motion for summary judgment (doc. 55) is DENIED.

Signed in Baton Rouge, Louisiana, on August 4, 2009.

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

activities and that one possible "violation of law" covered by the Assignment would be the storage "of oil and gas in such a manner as to result in a claim for an award of punitive damages." Doc. 68, page 10. This Court finds that questions of law and fact as to the allocation of punitive damages under the Settlement Agreement also preclude summary judgment at this time.

[21] Doc. 68, page 13.

[22] For the same reason, this Court does not reach the merits of Chevron's request for declaratory judgment.

[23] Accordingly, this Court does not consider Chevron's arguments regarding the reasonableness of its fees, costs, and expenses.